**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COMITE DE JORNALEROS DE
REDONDO BEACH; NATIONAL DAY
LABORER ORGANIZING NETWORK,
         *Plaintiffs-Appellees,*

    v.

CITY OF REDONDO BEACH,
         *Defendant-Appellant.*

No. 06-55750

D.C. No.
CV-04-09396-CBM

COMITE DE JORNALEROS DE
REDONDO BEACH; NATIONAL DAY
LABORER ORGANIZING NETWORK,
         *Plaintiffs-Appellees,*

    v.

CITY OF REDONDO BEACH,
         *Defendant-Appellant.*

No. 06-56869

D.C. No.
CV-04-09396-CBM

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted
March 21, 2011–San Francisco, California

Filed September 16, 2011

Before: Alex Kozinski, Chief Judge, Sidney R. Thomas,
Susan P. Graber, Ronald M. Gould, Marsha S. Berzon,
Jay S. Bybee, Consuelo M. Callahan, Carlos T. Bea,
Milan D. Smith, Jr., Sandra S. Ikuta, and N. Randy Smith,
Circuit Judges.

17633

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Ronald M. Gould;
Special Concurrence by Judge Milan D. Smith, Jr.;
Dissent by Chief Judge Alex Kozinski

**COUNSEL**

Michael W. Webb (argued), Office of the City Attorney, Redondo Beach, California; Eugene P. Ramirez and Julie M. Fleming, Manning & Marder, Kass, Ellrod, Ramirez LLP, Los Angeles, California, for the defendant-appellant.

Thomas A. Saenz (argued), Cynthia A. Valenzuela, and Kristina Campbell, Mexican American Legal Defense and Educational Fund, Los Angeles, California; Robert Rubin and Philip Hwang, Lawyers' Committee for Civil Rights, San Francisco, California; Angela L. Padilla and Alexei Klestoff, Morrison & Foerster LLP, San Francisco, California, for the plaintiffs-appellees.

Jeffrey V. Dunn and Marc S. Ehrlich, Best Best & Krieger LLP, Irvine, California, for the amicus curiae League of California Cities.

Paul J. Orfanedes and James F. Peterson, Judicial Watch, Inc., Washington, D.C., for the amicus curiae Judicial Watch, Inc.

Monica M. Ramirez and Lucas Guttentag, American Civil Liberties Union Foundation, Immigrants' Rights Project, San Francisco, California, for the amicus curiae Professor Abel Valenzuela, Jr.

Rebecca Smith, National Employment Law Project, Seattle, Washington; Haeyong Yoon, National Employment Law Project, New York, New York, for the amici curiae National Domestic Worker Alliance, National Employment Law Project, Restaurant Opportunities Center United, and Right to the City.

**OPINION**

M. SMITH, Circuit Judge:

A pair of day-laborer organizations challenge a City of Redondo Beach (Redondo Beach or the City) anti-solicitation ordinance that bars individuals from ™stand[ing] on a street or highway and solicit[ing], or attempt[ing] to solicit, employment, business, or contributions from an occupant of any motor vehicle.∫ Redondo Beach Municipal Code ß 3-7.1601(a) (the Ordinance). We agree with the day laborers that the Ordinance is a facially unconstitutional restriction on speech.

Our analysis is guided by certain well-established principles of First Amendment law. In public places such as streets and sidewalks, ™the State [may] enforce a content-based exclusion∫ on speech if the ™regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.∫ *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). For content-neutral regulations, the State may limit ™the time, place, and manner of expression∫ if the regulations are ™narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.∫ *Id.*

We conclude that the Ordinance fails to satisfy the narrow tailoring element of the Supreme Court's ™time, place, and manner∫ test. The Ordinance is not narrowly tailored because it regulates significantly more speech than is necessary to achieve the City's purpose of improving traffic safety and traffic flow at two major Redondo Beach intersections, and the City could have achieved these goals through less restrictive measures, such as the enforcement of existing traffic laws and regulations. Because the Ordinance does not constitute a reasonable regulation of the time, place, or manner of speaking, it is facially unconstitutional.

## I.  FACTS AND PRIOR PROCEEDINGS

### A.   Factual Background

In September 1986, we upheld a Phoenix ordinance that provided: ™ `No person shall stand on a street or highway and solicit, or attempt to solicit, employment, business or contributions from the occupants of any vehicle.'∫ *ACORN v. City of Phoenix*, 798 F.2d 1260, 1262 (9th Cir. 1986) (quoting Phoenix City Ordinance ß 36-101.01 (1984)). The Phoenix ordinance was designed to prevent members of the political action group ACORN ™from accosting the drivers and passengers of automobiles temporarily stopped at red traffic lights at city street intersections to solicit contributions to its cause.∫ *Id.* at 1261. We upheld the ordinance as ™a reasonable time, place, and manner regulation which preserves the city streets for safe and peaceful use by motorists when the streets are open to vehicle traffic.∫ *Id.* at 1273.

Six months later, the Redondo Beach City Attorney recommended that the Redondo Beach City Council adopt a nearly identical ordinance (the sole material difference being that the proposed ordinance defined ™street or highway∫ as including sidewalks, alleys, and other such locations, consistent with California law, *see, e.g.*, Cal. Veh. Code ßß 110, 555). In a memorandum that accompanied the proposed ordinance, the City Attorney noted: ™the City has had extreme difficulties with persons soliciting employment from the sidewalks along the Artesia corridor over the last several years. Recent developments have brought to the surface the problems with person[s] using medians and other portions of the street to sell certain products. [∂ ] There can be little question that traffic and safety hazards occur by this practice.∫

In a declaration filed with the district court, a City police officer added that the Redondo Beach Police Department had ™received numerous complaints from business owners and residents of the surrounding areas∫ near ™the intersection of

Artesia Boulevard and Felton Lane, and . . . the intersection of Manhattan Beach Boulevard and Inglewood Avenue." The police received complaints that the "day laborers who congregate at the subject intersections . . . interrupt the flow of traffic while they contact employers from the City sidewalks and streets[,] . . . commit acts of vandalism, litter, [and] urinate near the businesses" in the area.

The City adopted the proposed ordinance in May 1987. Following additional complaints about "the recurring gathering of day laborers along Artesia Boulevard," who "congregated on the sidewalks during the rush hours to obtain temporary employment," in 1989 the City added an additional subsection to the Ordinance prohibiting drivers from stopping in traffic to hire laborers. The Ordinance now reads in full:

> (a) It shall be unlawful for any person to stand on a street or highway and solicit, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle. For purposes of this section, "street or highway" shall mean all of that area dedicated to public use for public street purposes and shall include, but not be limited to, roadways, parkways, medians, alleys, sidewalks, curbs, and public ways.

> (b) It shall be unlawful for any person to stop, park or stand a motor vehicle on a street or highway from which any occupant attempts to hire or hires for employment another person or persons.

Redondo Beach Municipal Code ß 3-7.1601.

In October 2004, the City initiated the "Day Labor Enforcement Project." Over the course of two successive mornings, undercover officers posing as potential employers arrested thirty-five day laborers "for soliciting from stopped vehicles" under the Ordinance. Two weeks later, the police arrested

another twenty-one day laborers under the Ordinance. Two weeks after that, four day laborers were arrested under subsection (a) of the Ordinance, and a contractor was arrested under subsection (b) of the Ordinance. Arrested persons either posted $100 bail and were released, or were sent to court, entered guilty pleas, sentenced to three years probation and a 180-day suspended sentence, assessed a $314 booking fee, and enjoined from coming within 150 yards of the place they were arrested.

## B.    Procedural Background

Shortly after the City's 2004 enforcement efforts concluded, the Comite de Jornaleros de Redondo Beach (Comite) and National Day Laborer Organizing Network (NDLON) filed this lawsuit under 42 U.S.C. ß 1983 and 28 U.S.C. ß 2201.[1] Comite and NDLON (collectively, the Plaintiffs) alleged that the Ordinance is a facially unconstitutional restriction on day laborers' and other persons' First Amendment rights.

The district court agreed with the Plaintiffs, and issued a preliminary injunction barring the City from enforcing the Ordinance, which we affirmed on appeal. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 127 F. App'x 994 (9th Cir. 2005) (unpublished memorandum disposition). After the parties filed cross-motions for summary judgment, the district court issued final judgment for the Plaintiffs. *Comite I*, 475 F. Supp. 2d at 970. The court's order permanently enjoined the City from enforcing the Ordinance, and required the City to rescind any ™fines, penalties, or records of infractions∫ issued under the Ordinance (though the court later stayed enforcement of the latter part of its order.). *Id.* The court then awarded attorneys' fees to the Plaintiffs.

---

[1]™Comite identifies itself as `an unincorporated association comprised of day laborers who seek to defend their rights and address the difficulties that they face in seeking lawful employment as day workers.' NDLON identifies itself as `a nationwide coalition of day laborers and the agencies that work with day laborers.'∫ *Comite I*, 475 F. Supp. 2d at 955.

Believing itself bound by *ACORN*, a merits panel of our court reversed the district court's judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach* (*Comite II*), 607 F.3d 1178 (9th Cir. 2010), but we ordered that the case be reheard en banc, 623 F.3d 1054 (9th Cir. 2010) (order). We now affirm the district court and overrule *ACORN*, but only to the extent it is inconsistent with our en banc decision in this case.

## II.    JURISDICTION AND STANDARD OF REVIEW

We have appellate jurisdiction under 28 U.S.C. ß 1291. We review the district court's grant of summary judgment de novo. *Berger v. City of Seattle*, 569 F.3d 1029, 1035, 1049 (9th Cir. 2009) (en banc). In addressing the parties' cross-motions for summary judgment, we must draw all reasonable inferences in favor of the non-moving party, and determine whether a genuine issue of material fact precludes entry of summary judgment. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 255 (1986).

The City challenges the Plaintiffs' Article III standing to pursue this action. We adopt the three-judge panel's analysis as our own:

> Redondo Beach makes the threshold argument that Comite and NDLON lack standing to challenge the ordinance. To have standing under Article III, a plaintiff must have suffered an ™injury in fact,∫ defined as ™an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent.∫ *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). There also must be a causal connection between the injury and the defendant's conduct, and the injury must be redressable by a favorable decision. *Id.* at 561. Here Redondo Beach

argues that Comite and NDLON fail to satisfy the Article III injury-in-fact requirement.

An organization may establish a sufficient injury in fact if it substantiates by affidavit or other specific evidence that a challenged statute or policy frustrates the organization's goals and requires the organization "to expend resources in representing clients they otherwise would spend in other ways." *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1992); *see also Fair Housing of Marin v. Combs*, 285 F.3d 899, 904-05 (9th Cir. 2002). But "standing must be established independent of the lawsuit filed by the plaintiff." *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001).

NDLON has met the burden to establish its standing as an organization. The record contains declarations of NDLON officials that enforcement of the Redondo Beach ordinance has frustrated NDLON's mission "to strengthen and expand the work of local day laborer organizing groups" because it "has prevented day laborers from making their availability to work known in the City of Redondo Beach." Moreover, the ordinance has discouraged both employees and employers from participating in hiring transactions. Redondo Beach has offered no evidence to dispute these claims. NDLON also has offered uncontradicted evidence that enforcement of the ordinance has forced it to divert resources, independent of expenses for this litigation, that it would have spent in other ways. NDLON's west coast coordinator testified that she met with workers at the intersections targeted by Redondo Beach to discuss enforcement of the ordinance almost daily from the end of October 2004 until mid-December 2004, and weekly thereafter through June 2005. She also testi-

fied that she went to the police station to assist day laborers who had been arrested. NDLON's national coordinator testified that the time and resources spent in assisting day laborers during their arrests and meeting with workers about the status of the ordinance would have otherwise been expended toward NDLON's core organizing activities. In sum, NDLON has established a sufficient organizational injury for standing purposes. *See El Rescate*, 959 F.2d at 748.

Because there is a causal connection between Redondo Beach's ordinance and NDLON's injury, and NDLON's injury would be redressable by a favorable decision, we conclude that NDLON has standing to bring this appeal. Accordingly, we have jurisdiction over this facial challenge irrespective of Comite's standing. ™Where the legal issues on appeal are fairly raised by one plaintiff [who] had standing to bring the suit, the court need not consider the standing of the other plaintiffs.∫ *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 918 (9th Cir. 2004) (alteration in original) (internal quotation marks omitted). Therefore, we do not address the parties' remaining standing arguments, including Redondo Beach's evidentiary arguments.

*Comite II*, 607 F.3d at 1182-83.

We also reject the City's belated contention that the Plaintiffs failed to allege standing adequately in their complaint. We exercise our discretion to conform the pleadings to the evidence submitted during summary judgment, which, as described *supra*, is adequate to establish standing in this case. *See* 28 U.S.C. ß 1653 (™Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.∫); *see also Chandler v. Miller*, 520 U.S. 305, 313 n.2

(1997) (amending pleadings under 28 U.S.C. ß 1653 to reject mootness argument).

## III.  DISCUSSION

### A.  Applicable Principles of First Amendment Law

Certain general principles of First Amendment law guide our analysis. ™When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.∫ *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000). In a facial challenge to a law's validity under the First Amendment, the ™law may be invalidated as overbroad if `a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'∫ *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). The party challenging the law need not necessarily introduce admissible evidence of overbreadth, but generally must at least ™describe the instances of arguable overbreadth of the contested law.∫ *Wash. State Grange*, 552 U.S. at 449 n.6. The overbreadth doctrine exists ™out of concern that the threat of enforcement of an overbroad law may deter or `chill' constitutionally protected speech–especially when the overbroad statute imposes criminal sanctions.∫ *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

Because of the Court's concern about chilling protected speech, ™[i]n the First Amendment context attacks have been permitted `on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'∫ *Parker v. Levy*, 417 U.S. 733, 759 (1974) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)). ™Where . . . a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's

objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967-68 (1984) (footnote omitted); *see also Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984) ("[W]here the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack.").

**[1]** Solicitation constitutes protected expression under the First Amendment. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677-78 (1992) (citing *United States v. Kokinda*, 497 U.S. 720, 725 (1990); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 788-89 (1988); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.* (*Heffron*), 452 U.S. 640 (1981)). Solicitation "is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," so that "without solicitation the flow of such information and advocacy would likely cease." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980).[2]

**[2]** Public streets and sidewalks "occup[y] a `special position in terms of First Amendment protection.'" *Snyder v.*

---

[2]The City does not argue that the Ordinance applies only to commercial solicitation, and its text does not limit its reach to the commercial context. Thus, we cannot, and do not, decide the Ordinance's validity under the Supreme Court's "commercial speech" case law. *See Comite II*, 607 F.3d at 1184 n.3. Nevertheless, the Dissent erroneously suggests that an "impromptu labor market . . . is the subject of this lawsuit." Dissent at 17670. Perhaps the Dissent's characterization would be tenable if the Plaintiffs had brought an as-applied challenge, or if the City had sought refuge under the commercial speech doctrine, but since neither of these possibilities occurred, we need not further consider the Dissent's perspective on this issue.

*Phelps*, 131 S. Ct. 1207, 1218 (2011) (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). They are ™ `the archetype of a traditional public forum.' ∫ *Id.* (quoting *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)). Because the Ordinance regulates protected speech in a public forum, we apply the ™time, place, and manner∫ test: ™the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions `are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' ∫ *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

Having outlined these guiding principles, we now proceed to the ™time, place, and manner∫ analysis described in *Ward* and numerous other cases. We assume for purposes of our decision that the Ordinance is content neutral. *See City of Ladue v. Gilleo*, 512 U.S. 43, 53 n.11 (1994) (™we set to one side the content discrimination question∫).[3]

## B.  Construing the Ordinance

™The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.∫ *United States v. Williams*, 553 U.S. 285, 293 (2008).

[3] The City claims that the Ordinance can be construed to regulate only solicitation *conduct*, not solicitation *speech*, such that the Ordinance only prohibits the *acts* of negotiating employment terms, entering a car, and exchanging money. We disagree with the City's characterization of the Ordi-

---

[3]Because we conclude that the Ordinance is not a valid time, place, and manner restriction, we do not address the Plaintiffs' alternative argument that the Ordinance is unconstitutionally vague.

nance. The Ordinance applies to more than an actual physical exchange. "Solicitation" is defined broadly as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition." *Black's Law Dictionary* 1520 (9th ed. 2009); *see also Berger*, 569 F.3d at 1090 n.6 (N.R. Smith, J., concurring in part) ("A common dictionary defines `solicit' as `to approach with a request or a plea (as in selling or begging) . . . to endeavor to obtain by asking or pleading . . . .' " (quoting *Webster's Third New International Dictionary* 2169 (unabridged ed. 1993))). In other words, "[a] solicitation is nothing more than a request in which the solicitor communicates, in some fashion, his desire that the person solicited do something, such as give money, join an organization, transact business, etc." *Berger*, 569 F.3d at 1090 (N.R. Smith, J., concurring in part). On its face, the Ordinance applies both to those who "solicit" or who "*attempt* to solicit," and it extends to the solicitation of "employment" and "business," not just "contributions." Redondo Beach Municipal Code ß 3-7.1601(a) (emphasis added). In light of the Ordinance's prohibition on the solicitation and attempted solicitation of employment and business, the Ordinance plainly addresses speech in addition to conduct.

[4] The City argues that we should construe the Ordinance narrowly to apply only to solicitors who "cause motorists to stop in traffic lanes in response to the solicitation." As support for this reading, the City submits (through its City Attorney's affidavit) that it has applied the Ordinance only against individuals who cause motorists to stop in traffic, and that it has no intention of altering this practice. It is true that, when analyzing a "facial challenge," we must consider the [City]'s authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). "Although we must consider the City's limiting construction of the Ordinance, we are not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance." *Foti v. City of Menlo Park*, 146 F.3d

629, 639 (9th Cir. 1998). Here, the plain language of the Ordinance, which prohibits solicitation by persons standing on a street or highway, is not reasonably susceptible to the City's narrowing construction. *See Reno v. ACLU*, 521 U.S. 844, 884 (1997) ("In considering a facial challenge, this Court may impose a limiting construction on a statute only if it is `readily susceptible' to such a construction." (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988))); *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987) (refusing to adopt limiting construction where "the words of the resolution simply leave no room for a narrowing construction"). The City's proposed "causation" requirement finds absolutely no support in the statutory text or the legislative history of the Ordinance.[4] We cannot simply "presume[ ] the [City] will act in good faith and adhere to standards absent from the ordinance's face." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988); *see also Stevens*, 130 S. Ct. at 1591 ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

The illogic of the City's proposed limiting construction is revealed in a pair of hypotheticals submitted here and in the district court. The City states on appeal that the Ordinance would not apply to a person standing on the sidewalk holding a sign that says "Looking for work." (Internal quotation marks omitted.) In the district court, the City asserted that the Ordinance *would* apply to a person standing on the sidewalk hold-

---

[4]Apparently the Dissent agrees with us that the City's proposed interpretation is untenable. The Dissent's lengthy statutory analysis fails to provide support for the City's proposed "causation" element. *See* Dissent at 17672-78. Instead, the Dissent proffers a narrowing construction that does nothing to alleviate the Ordinance's overbreadth problems. *See* Dissent at 17672-74. Our conclusion that the Ordinance is not narrowly tailored applies regardless of whether or not we adopt the Dissent's proposed construction.

ing a sign that says "I'm available to be hired today, Please stop and talk to me." Internal quotation marks omitted.) The proposed distinguishing feature –*please stop and talk to me* –is wholly absent from the face of the Ordinance, and we cannot rewrite the Ordinance to supply the missing concept. *See, e.g., Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.,* 482 U.S. 569, 575 (1987) (refusing to adopt limiting construction where "the words of the resolution simply leave no room for a narrowing construction").

In sum, we are not bound by the City officials' assurances that they have not, and will not, enforce the Ordinance against anything other than solicitations causing motorists to stop in traffic. Similarly, the Ordinance is not reasonably susceptible to the narrowing constructions proposed by the City. We therefore decline the City's invitation to rewrite the statute's plain language.[5]

## C.   Narrow Tailoring

[5] "[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests." *Ward*, 491 U.S. at 798. The regulation "need not be the least restrictive or least intrusive means of" achieving the government's goals, but it may not "burden substantially more speech than is necessary." *Id.* at 798-99. Put another way, the regulation must "focus[ ] on the source of the evils the city seeks to eliminate . . . and eliminate[ ] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Id.* at 799 n.7.

---

[5]*ACORN* is overruled to the extent that it construed a substantially identically worded ordinance as facially restricting only solicitation conduct. (Our construction in *ACORN* remains viable with respect to its analysis of the ordinance as applied to ACORN's conduct.) *See ACORN*, 798 F.2d at 1272 (agreeing with the district court that "there was no evidence to suggest that the Phoenix ordinance curtailed any activity other than solicitation from vehicles at an intersection").

**[6]** The City contends that the Ordinance is narrowly tailored to achieve the City's "interest in promoting traffic flow and safety."[6] It is undisputed that "[g]overnmental authorities have the duty and responsibility to keep their streets open and available for movement." *Cox v. Louisiana*, 379 U.S. 536, 554-55 (1965); *see also Heffron*, 452 U.S. at 650 ("[A] State's interest in protecting the `safety and convenience' of persons using a public forum is a valid governmental objective."). It is also undisputed that traffic flow and traffic safety are a legitimate problem in certain parts of Redondo Beach.

The disputed issue is whether the Ordinance is narrowly tailored to further these valid purposes. To satisfy the narrow tailoring requirement, "the Government . . . bears the burden of showing that the remedy it has adopted does not `burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994) (quoting *Ward*, 491 U.S. at 799). We conclude that the Ordinance is not narrowly tailored because the Ordinance restricts significantly more speech than is necessary, and because the City could have employed various less restrictive alternatives to achieve its goals.

**[7]** The Plaintiffs have identified several "obvious examples" of prohibited speech that do not cause the types of problems that motivated the Ordinance. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 166 (2002). The Ordinance "technically appl[ies]" to children selling lemonade on the sidewalk in front of their home, as well as to Girl Scouts selling cookies on the sidewalk outside of their school" and would prohibit "signbearers on sidewalks

---

[6]Although the Ordinance may have been enacted in part to reduce public nuisances such as littering, vandalism, public urination, and harassment of pedestrians, the City does not argue on appeal that the Ordinance is narrowly tailored to achieve these goals. " `We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim.'" *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 n.1 (9th Cir. 2008) (quoting *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994)).

seeking patronage or offering handbills even though their conduct does not pose a traffic hazard." *Comite II*, 607 F.3d at 1206 (Wardlaw, J., dissenting) (internal quotation marks omitted), as well as prohibit sidewalk food vendors from advertising their wares to passing motorists. The Ordinance applies "to a motorist who stops, on a residential street, to inquire whether a neighbor's teen-age daughter or son would be interested in performing yard work or babysitting." *Comite I*, 475 F. Supp. 2d at 965. As the Plaintiffs observe, the Ordinance even applies to "school children shouting `carwash' at passing vehicles," and "protestors imploring donations to a disaster relief fund."[7] Thus, because the Ordinance is significantly overinclusive, it is not narrowly tailored. *See, e.g.*, *Watchtower Bible*, 536 U.S. at 168 (holding permitting requirement for all door-to-door solicitation to be "not tailored to the Village's stated interests" because "[e]ven if the interest in preventing fraud could adequately support the ordi-

---

[7]Contrary to the City's argument, we are not "hypothesizing about speculative unlawful applications" of the Ordinance; we are simply listing some of the many types of protected speech that fall squarely within the plain language of this facially overbroad law.

As noted *supra*, although the Supreme Court stated in *Washington State Grange* that, "[i]n determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about `hypothetical' or `imaginary' cases," the Court acknowledged in a footnote that First Amendment overbreadth challenges are subject to a less-demanding standard, which requires only that "the parties . . . describe the instances of arguable overbreadth of the contested law." 552 U.S. at 449-50 & n.6. If the suggested examples fall within the plain language of the statute, the Plaintiffs have met their burden. *See, e.g.*, *City of Houston v. Hill*, 482 U.S. 451, 466-67 (1987) ("Houston's ordinance criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement. The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals–those chosen by the police in their unguided discretion–are arrested. Far from providing the `breathing space' that `First Amendment freedoms need to survive,' the ordinance is susceptible of regular application to protected expression." (ellipsis omitted) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963))).

nance insofar as it applies to commercial transactions and the solicitation of funds, that interest provides no support for its application to petitioners, to political campaigns, or to enlisting support for unpopular causes∫).

[8] The Ordinance is also geographically overinclusive. The Ordinance applies citywide to all streets and sidewalks in the City, yet the City has introduced evidence of traffic problems only with respect to a small number of major streets and medians. The City has offered no evidence to justify extending its solicitation ban throughout the City in such a sweeping manner. Because the burden rests on the City to submit evidence in support of its position, we cannot simply assume that the City's other streets, alleys, and sidewalks allegedly suffer from similar solicitation-related traffic problems. By applying the Ordinance citywide to all streets, alleys, and sidewalks, the City has burdened substantially more solicitation speech than is reasonably necessary to achieve its purpose. *See, e.g.,* *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939) (invalidating anti-handbilling ordinances even though ™their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places∫); *cf. Hill*, 530 U.S. at 730 (™[T]he . . . restriction occurs only within 100 feet of a health care facility–the place where the restriction is most needed.∫); *Frisby*, 487 U.S. at 486-87 (upholding picketing ban that was limited to residential areas of city, not entire city); *Heffron*, 452 U.S. at 652 (upholding solicitation restriction that was limited to 125-acre fairground, not entire city); *Grayned*, 408 U.S. at 119-20 (upholding anti-noise ordinance that was limited to school grounds during school hours). In fact, the Ordinance does not even distinguish between lawfully parked cars and cars moving in traffic, and there is no reason to believe (nor has the City provided evidence) that a lawfully parked car would create the types of traffic problems described by the City. *Cf. ACORN*, 798 F.2d at 1270 (affirming district court's finding ™that the mere presence of taggers on the roadway or intersection is a potential safety hazard∫ (internal quotation marks omitted)).

**[9]** The impact of this overinclusiveness is particularly significant because the City has a number of less restrictive means of achieving its stated goals. Though we cannot apply a stringent least-restrictive-alternative test, we also cannot uphold the Ordinance if it "burden[s] substantially more speech than is necessary" to protect traffic safety and flow. *Ward*, 491 U.S. at 799. The City has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech. The City need only enforce laws against jaywalking, Cal. Veh. Code ß 21954, stopping in traffic alongside a red-painted curb,[8] *id.* ß 22500(c), and stopping a car "so as to obstruct the normal movement of traffic," *id.* ß 22651(b). Or the City could enforce its own ordinances that provide that "[n]o person shall stand in any roadway, other than in a safety zone or in a crosswalk, if such action interferes with the lawful movement of traffic[,]" and "[n]o pedestrian shall stop or stand on a sidewalk except as near as is physically possible to the building line or the curb line at any place in the Central Traffic District or any business district." Redondo Beach Municipal Code ßß 3-7.1004, .1005. Even under the intermediate scrutiny "time, place, and manner" analysis, we cannot ignore the existence of these readily available alternatives. *See, e.g.*, *Vill. of Schaumburg*, 444 U.S. at 637 ("The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."); *Schneider*, 308 U.S. at 162, 164 ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets. . . . Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to

---

[8]The City acknowledges that "the lanes nearest the curb[s of the intersections at issue] are traffic lanes, posted with `No Stopping Anytime' signs."

decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.∫). As the Supreme Court has explained in the analogous commercial speech context, ™if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the `fit' between ends and means is reasonable.∫ *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417 n.13 *(1993); see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001) (noting that the ™framework for analyzing regulations of commercial speech . . . is `substantially similar' to the test for time, place, and manner restrictions∫ (quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989)). Here, there are a number of feasible, readily identifiable, and less-restrictive means of addressing the City's concerns.[9] The Ordinance is not narrowly tailored.

**[10]** Although the City need not necessarily employ the *least*-restrictive alternative, it may not select an option that

---

[9]The Dissent incorrectly asserts that ™city authorities have tried for years to use other laws to deal with day laborers.∫ Dissent at 17678. First, the Dissent quotes Sergeant Contreras's statement that ™warnings∫ and ™[r]andom enforcement∫ were ™ineffective.∫ But read in context, Sergeant Contreras's statement refers to the City's enforcement *of the Ordinance itself*, not other laws. The same goes for the evidence of business leaders' complaints. *See* Dissent at 17678-80.

The Dissent also quotes City Attorney Webb's statement that the City's ™enforcement of other applicable laws∫ was ™largely unsuccessful.∫ Dissent at 17679. But the district court held this statement inadmissible because Webb failed to establish his personal knowledge of this fact. *Comite I*, 475 F. Supp. 2d at 970. Contrary to the Dissent's selective reading of the Federal Rules of Civil Procedure, Rule 56 explicitly requires that summary judgment affidavits ™be made on personal knowledge.∫ Fed. R. Civ. P. 56(c)(4); *see also, e.g., Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (™[C]onclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient.∫ (internal quotation marks omitted)).

unnecessarily imposes significant burdens on First Amendment-protected speech. ™If the First Amendment means anything, it means that regulating speech must be a last –not first–resort.∫ *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). Because the Ordinance ™suppress[es] a great quantity of speech that does not cause the evils that it seeks to eliminate,∫ *Ward*, 491 U.S. at 799 n.7, it is facially invalid. We do not doubt that a properly drawn ordinance could achieve the City's goals; however, *this* Ordinance does not pass the test.[10]

## IV.   CONCLUSION

Because the Ordinance is not narrowly tailored to achieve the City's goals, it is facially unconstitutional. The decisions of the district court invalidating the Ordinance, and awarding attorneys' fees to the Plaintiffs, are

**AFFIRMED**.

---

GOULD, Circuit Judge, concurring in judgment:

I agree that the City of Redondo Beach did not narrowly tailor its ordinance, nor meet its burden to show that the Ordinance leaves open ample alternative channels of communication for day laborers. *See Ward v. Rock Against Racism*, 491

---

[10]The dissent urges us to sever the offending provision of this statute, so as to strike down subsection (a), which applies to the day laborers, and leave intact subsection (b). Dissent at 17681-85. Because the City has waived any argument regarding severability by failing to raise it in its briefs or at oral argument, we do not consider it here. *See*, *e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 549 (2001); *United States v. City of Arcata*, 629 F.3d 986, 992 (9th Cir. 2010).

The City has also waived any objections regarding the vagueness of the district court's injunction. *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999).

U.S. 781 (1989). If the City had designated a permissible area for day laborer solicitation, in a convenient location for day laborers and potential employers alike, I would hold that the ordinance was a reasonable time, place, and manner restriction. We err when we make it so hard for municipalities to satisfy the test for reasonable restraints on time, place, and manner of speech that these municipalities cannot achieve important public goals like traffic safety while preserving speech. But because the day laborers here were shut out of the City of Redondo Beach, and left without any practical way to reach their intended audience with a message of job solicitation, *see City of Ladue v. Gilleo*, 512 U.S. 43, 56-58 (1994), and because the City's goals could have been effectively accomplished with a narrower ordinance that did not cover all streets and that recognized permissible solicitation locations, I concur in the judgment.

---

M. SMITH, Circuit Judge, with whom THOMAS, Circuit Judge, joins, and with whom GRABER, Circuit Judge, joins as to Part I, specially concurring:

I agree with my colleagues in the majority that the Ordinance is not narrowly tailored. I write separately to set forth two additional reasons why I believe the Ordinance should be declared facially invalid: it is a content-based restriction on speech that does not withstand strict scrutiny, and, even if it were content neutral, it does not leave open ample alternative channels of communication.

## I.   CONTENT NEUTRALITY

There are two methods for determining whether a statute is content neutral or content based. First, ™a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based.∫ *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Second, ™laws that by their

terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Id.* at 643. Because the second line of inquiry clearly reveals a content-based law, I need not consider whether the City harbored a content-based purpose.

The governing test is straightforward: "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring in the judgment); *see also Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2723-24 (2010) (deeming law to be content based because the validity of plaintiffs' speech "depends on what they say"). "Deciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broad. Sys.*, 512 U.S. at 642, but the Supreme Court's case law is instructive. Some examples of content-based restrictions include laws that allow labor-related picketing but prohibit all other forms of picketing, *Carey v. Brown*, 447 U.S. 455, 460-61 (1980); *Police Dept. of Chi. v. Mosley*, 408 U.S. 92, 95-96 (1972); a rule that bars utilities from " `discuss[ing] political matters' " in their communications with customers, *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n*, 447 U.S. 530, 532 (1980) (citation omitted); an ordinance that allows newsracks promoting newspapers but bans newsracks promoting advertising circulars, *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429 (1993); and a law that "taxes general interest magazines, but exempts newspapers and religious, professional, trade, and sports journals." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 223 (1987). In contrast, examples of content-neutral restrictions include a law regulating all picketing regardless of its content or subject matter, *Frisby v. Schultz*, 487 U.S. 474, 477, 481-82 (1988); an ordinance banning "the posting of [all] signs on public property." *Members of the City Council of L.A. v. Taxpayers for Vincent* (*Taxpayers for Vincent*), 466 U.S. 789, 791 (1984); and, most relevantly, a law regulating

*all* ™sales, distribution, and fund solicitation operations∫ at a state fair, *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.* (*Heffron*), 452 U.S. 640, 644 (1981).

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), provides useful guidance regarding facially content-based laws. A city ordinance banned cross burning with the intent to intimidate ™on the basis of race, color, creed, religion or gender.∫ *Id.* at 391 (internal quotation marks omitted). The Court explained that, although ™fighting words∫ are generally subject to prohibition, the government must justify (under strict scrutiny) any content- or subject matter-based distinction among different types of fighting words. *Id.* at 384-85. Regarding the cross-burning ordinance before it, the Court wrote: ™Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics∫–i.e., ™ `race, color, creed, religion or gender.' ∫ *Id.* at 391. In contrast, ™[t]hose who wish to use `fighting words' in connection with other ideas–to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality–are not.∫ *Id.* In other words, a law is content based even if it does not promote or prohibit a particular viewpoint. As the Court explained, *all* forms of ™content discrimination raise[ ] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.∫ *Id.* at 387 (internal quotation marks omitted). Merely restricting speech on a particular topic triggers strict scrutiny.

Having considered these background principles, I now turn to the most analogous example of a content-based law, which appears in *Burson v. Freeman*, 504 U.S. 191, 193-94 (1992). The statute at issue in *Burson* prohibited soliciting votes near polling places on election day. *Id.* Although the Court was divided over how to resolve the case, the Justices unanimously agreed that the law was content based. *Id.* at 197 (plurality opinion); *id.* at 215 (Scalia, J., concurring in the

judgment); *id.* at 224 (Stevens, J., dissenting). As explained by the plurality opinion,

> Whether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a political campaign. The statute does not reach other categories of speech, such as commercial solicitation, distribution, and display. This Court has held that the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic.

*Id.* at 197 (plurality opinion).

In light of this authority, the Redondo Beach Ordinance is content based on its face. It is essentially the inverse of the law reviewed in *Burson*: it prohibits certain subject matters—any solicitation related to ™employment, business, or contributions∫—and allows all other solicitation (such as political solicitation) to continue unabated. Under the Ordinance, individuals may not stand on Redondo Beach streets or sidewalks and communicate with motorists to ™[s]olicit[ ] alms and contributions,∫ *United States v. Kokinda*, 497 U.S. 720, 724 (1990) (internal quotation marks omitted); solicit clients for their business, *see Edenfield v. Fane*, 507 U.S. 761, 766 (1993); or solicit contributions to a political fund, *see Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 201-02 (1982). They may, however, stand on those same streets or sidewalks and communicate with motorists to solicit votes, *see Burson*, 504 U.S. at 193-94; solicit support for pending legislation, *see E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961); solicit membership in a church, labor union, or other organization, *cf. Thomas v. Collins*, 323 U.S. 516, 537 (1945); or, as the Plaintiffs and Amici point out, solicit moral support (as occurs at labor pickets and political rallies, for example).

Thus, the Ordinance is facially content based: some solicitation speech is permitted and other solicitation speech is restricted. Individuals are subject to the Ordinance "depend[ing] on what they say." *Humanitarian Law Project*, 130 S. Ct. at 2723-24. If they request "employment, business, or contributions" they are subject to criminal sanction, but if they request anything else, they are unaffected.

I recognize that the Supreme Court's decision in *Hill v. Colorado*, 530 U.S. 703 (2000), could be read to cast some doubt upon this conclusion. *Hill* addressed a "Colorado statute that regulate[d] speech-related conduct within 100 feet of the entrance to any health care facility." *Id.* at 707. The statute "ma[de] it unlawful within the regulated areas for any person to `knowingly approach' within eight feet of another person, without that person's consent, `for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person.' " *Id.* (quoting Colo. Rev. Stat. § 18-9-122(3) (1999)). The Court first stated three reasons why the statute was content neutral under *Ward v. Rock Against Racism*, 491 U.S. 781 (1989):

> First, it is not a "regulation of speech." Rather, it is a regulation of the places where some speech may occur. Second, it was not adopted "because of disagreement with the message it conveys." This conclusion is supported not just by the Colorado courts' interpretation of legislative history, but more importantly by the State Supreme Court's unequivocal holding that the statute's "restrictions apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech." Third, the State's interests in protecting access and privacy [at medical facilities], and providing the police with clear guidelines, are unrelated to the content of the demonstrators' speech. As we have repeatedly explained, government regulation of expressive activity is "content neutral" if it is

> justified without reference to the content of regulated speech.

*Hill*, 530 U.S. at 719-20 (footnote omitted).

Were this the entirety of the Court's reasoning, I would be hard pressed to conclude that the Redondo Beach Ordinance is content based. The Court's three-part analysis focused almost entirely on questions of legislative motivations and viewpoint neutrality. But the Court did not use this three-part test as the exclusive method of determining content neutrality. Instead, it reaffirmed *Carey v. Brown*'s core holding that the "prohibition on discussion of *particular topics*" and the "[r]egulation of the *subject matter* of messages, though not as obnoxious as viewpoint-based regulation, [are] also . . . objectionable form[s] of content-based regulation." *Hill*, 530 U.S. at 722-23 (emphases added). The Court then concluded that the Colorado statute restricted "an extremely broad category of communications," but not any particular "subject matter[s]," *id.* at 723, because "[i]t applie[d] to all `protest,' to all `counseling,' and to all demonstrators," *id.* at 725.

In a particularly relevant observation, the Court noted that the Colorado "statute applies equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries." *Id.* at 723. That statement is not true with respect to the Redondo Beach Ordinance. On Redondo Beach streets and sidewalks, "used car salesmen" and "fundraisers" are unable to practice their respective crafts of selling and fundraising, whereas "missionaries," "animal rights activists," and "environmentalists," are free to solicit religious conversion, political assistance, and moral support. In other words, the Ordinance does not simply regulate "extremely broad categor[ies] of communications," *id.* at 723, such as *all* requests and solicitations (as was the case in *Heffron*, 452 U.S. at 644). Rather, the Ordinance regulates particular "subject matter[s]" within those broad categories. *Hill*, 530 U.S. at 723. Thus *Hill*, rather than supporting the City's argument

that the Ordinance is content neutral, cuts in favor of my conclusion to the contrary.

In sum, I would conclude that the Ordinance is a content-based, rather than content-neutral, restriction on speech. It restricts discussion of certain subject matters–namely, speech that requests employment, business, and contributions –while allowing free discussion about other subject matters. Under *Burson v. Freeman*, *R.A.V. v. City of St. Paul*, *Carey v. Brown*, *Chicago v. Mosley*, *Consolidated Edison*, *City of Cincinnati v. Discovery Network*, and *Arkansas Writers' Project*, the Ordinance is a content-based restriction on speech.

"Content-based regulations are presumptively invalid," *R.A.V.*, 505 U.S. at 382, and may be upheld only if they satisfy "the most exacting scrutiny," *Turner Broad. Sys.*, 512 U.S. at 642. Such regulations "must be narrowly tailored to promote a compelling Government interest," and "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative," *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Because the Ordinance is not narrowly tailored under the intermediate-scrutiny "time, place, and manner" test discussed in the majority opinion, it fails to satisfy strict scrutiny.

## II.    ALTERNATIVE CHANNELS OF COMMUNICATION

In addition, even assuming (as the majority opinion does) that the Ordinance is content neutral, I would conclude the Ordinance does not leave open ample alternative channels for the Plaintiffs to engage in their protected speech. *See Ward*, 491 U.S. at 791 ("[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions . . . leave open ample alternative channels for communication of the information." (internal quotation marks omitted)). The City bears the burden of mak-

ing this showing. *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000) (collecting cases).

The Supreme Court's case law provides guidance on how to apply this standard. As explained in *City of Ladue v. Gilleo*, 512 U.S. 43, 56-57 (1994), and *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 93 (1977), the proffered alternatives must allow the speaker to reach his or her intended audience, in an equally effective manner as the prohibited speech, and without incurring meaningfully greater costs in time or money. In *Linmark Associates*, the Court overturned a ban on "for sale" signs in residential neighborhoods, explaining:

> Although in theory sellers remain free to employ a number of different alternatives, in practice realty is not marketed through leaflets, sound trucks, demonstrations, or the like. The options to which sellers realistically are relegated– primarily newspaper advertising and listing with real estate agents– involve more cost and less autonomy than "For Sale" signs, are less likely to reach persons not deliberately seeking sales information, and may be less effective media for communicating the message that is conveyed by a "For Sale" sign in front of the house to be sold. The alternatives, then, are far from satisfactory.

431 U.S. at 93 (citations omitted). Similarly, in *City of Ladue*, the Court overturned an ordinance that barred residents from posting any type of sign on their property (with some exceptions that were not relevant to the Court's analysis). The Court emphasized that the prohibited speech "may have no practical substitute," particularly "for persons of modest means." 512 U.S. at 57. The Court rejected alternatives such as "taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a handheld sign," because "the added costs in money or time"

of those alternatives "make the difference between participating and not participating in some public debate." *Id.* The Court further observed that the speakers' intended audience– their neighbors–"could not be reached nearly as well by other means." *Id.*

The Court has engaged in a similar mode of analysis dating back to at least the 1940s. *See Martin v. City of Struthers*, 319 U.S. 141, 146 (1943) ("Door to door distribution of circulars is essential to the poorly financed causes of little people."); *Milk Wagon Drivers Union of Chi., Local 753 v. Meadowmoor Dairies, Inc.*, 312 U.S. 287, 293 (1941) ("Peaceful picketing is the workingman's means of communication."). More recently, the Court has acknowledged its "special solicitude for forms of expression that are much less expensive than feasible alternatives." *Taxpayers for Vincent*, 466 U.S. at 812 n.30.

That being said, the Court has not always rejected a defendant's proposed alternative means of communication. In *Heffron*, the Court was persuaded that solicitors were free to engage in their protected speech anywhere outside the 125-acre state fairgrounds, and were also free to rent a booth inside the fairgrounds for the same purpose. 452 U.S. at 654-55. In *Taxpayers for Vincent*, the Court upheld a ban on placing posters on public property because there was no evidence "that the posting of political posters on public property is a uniquely valuable or important mode of communication." 466 U.S. at 812. Finally, in *Frisby v. Schultz*, the Court upheld a ban on picketing in front of individual residences because protestors could still "enter such neighborhoods, alone or in groups, even marching," "go door-to-door to proselytize their views," "distribute literature" door-to-door "or through the mails," and "contact residents by telephone"– any of which would reasonably allow the underlying message to be disseminated to the intended audience. 487 U.S. at 484 (internal quotation marks omitted).

Here, however, the City fails to identify adequate alternatives, making this case more like *Linmark Associates* and *City of Ladue* than *Heffron*, *Taxpayers for Vincent*, and *Frisby*. The City first relies on the alternatives upheld in *ACORN*: "solicitation on the sidewalk from pedestrians, canvassing door-to-door, telephone campaigns, or direct mail." *ACORN v. City of Phoenix*, 798 F.2d 1260, 1271 (9th Cir. 1986). However, the City has not actually met its burden of submitting *evidence* to establish that these alternatives are effective for day laborers. Although our three-judge panel may have been bound to accept these alternatives as a matter of *stare decisis*, our en banc panel is not so bound. I find no evidence in the record that day laborers could effectively employ the alternatives listed in *ACORN*. Likewise, there is no evidence to support the Dissent's claim that "many" day laborers advertise in the newspaper and on Craigslist. Dissent at 17685. Day laborers simply cannot effectively communicate their intended message ("I am available to work today") to their intended audience (contractors, homeowners, and other potential employers) by soliciting pedestrians, canvassing door-to-door, or mailing and calling individuals and businesses directly. *See Linmark Assocs.*, 431 U.S. at 93. The proposed alternatives impose obvious "added costs in money [and] time" as compared to solicitation on public streets, which renders these options inadequate as a matter of law. *City of Ladue*, 512 U.S. at 57.

The City next argues that the day laborers could simply congregate in nearby private parking lots. But as the Plaintiffs correctly point out, it is impermissible for the City to "force speakers out of public fora and onto private property." The Supreme Court has never allowed privately owned venues to substitute for public fora. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) ("Whether petitioner might have used some other, privately owned, theater in the city for the production is of no consequence."); *see also ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 791 (9th Cir. 2006) ("There is a growing nationwide trend toward the privatization of pub-

lic property. . . . If this trend of privatization continues–and we have no reason to doubt that it will–citizens will find it increasingly difficult to exercise their First Amendment rights to free speech, as the fora where expressive activities are protected dwindle.∫ (internal quotation marks omitted)).

Finally, the City argues that an adequate alternative would be for day laborers to congregate at one of the six ™day laborer centers in Southern California∫ listed on Plaintiff NDLON's website. However, none of the centers is located anywhere near Redondo Beach. (The Dissent suggests that these ™centers are easy to find∫ and that employers face ™a minimum of inconvenience∫ when traveling there. Dissent at 17685. These assertions find no support in the record and, indeed, seem to contradict the obvious reality that traveling in Southern California is rarely, if ever, minimally inconvenient.) Thus, the City's proposed ™alternative∫ fails to allow the Plaintiffs to reach their intended audience: residents of Redondo Beach and neighboring areas. *See Linmark Assocs.*, 431 U.S. at 93. ™[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.∫ *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939); *see also Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76 (1981) (rejecting citywide ban on live entertainment because ™there is no evidence in this record to support the proposition that the kind of entertainment appellants wish to provide is available in reasonably nearby areas∫).

Accordingly, in addition to concluding that the Ordinance is a content-based restriction that does not satisfy strict scrutiny, I would also conclude that the City has failed to meet its burden of showing that there are ample alternative channels available for the Plaintiffs to engage in protected solicitation.

Chief Judge KOZINSKI, with whom Judge BEA joins, in deep dissent:

This is folly.

For years, the city of Redondo Beach has had a serious problem with day laborers–sometimes as many as seventy-five–crowding sidewalks and street-corners, soliciting work from passing motorists. *See* Appendix 1. As might be expected when large groups of men gather at a single location, they litter, vandalize, urinate, block the sidewalk, harass females and damage property. Cars and trucks stop to negotiate employment and load up laborers, disrupting traffic.[1]

---

[1] The majority recognizes that ™the Ordinance may have been enacted in part to reduce public nuisances such as littering, vandalism, public urination, and harassment of pedestrians,∫ but doesn't consider these justifications because ™the City does not argue on appeal that the Ordinance is narrowly tailored to achieve these goals.∫ Maj. op. at 17651 n.6. But the city mentions these problems no fewer than six times in its opening brief (Blue Brief at 7, 12, 13, 42, 48 and 63, which includes the fact section, the summary of argument and the section dealing with narrow tailoring). Here's a sample:

> c.   *The Ordinance Is Narrowly Tailored to Promote the City's Recognized Significant Government Interests.*
>
> > i.   *The Ordinance Meets the* Ward *Standard for Narrow Tailoring.*
> >
> > . . . .
> >
> > The only factual distinction between this case and *ACORN* is that *ACORN* addressed the application of an essentially identical ordinance to people who went into the street to solicit cars that already had stopped at a red light. Here, the Ordinance is applied to people who, by their actions, *cause* cars to stop in traffic. There is no principled distinction between these two factual scenarios that changes the conclusion that both ordinances are narrowly tailored. Indeed, the facts here show a greater traffic safety impact than the facts of *ACORN*. The public safety issues in this case– interruption of and congestion of traffic, vandalism, litter,

Residents and businesses need not suffer these harms and indignities day in and day out for years on end. It is to secure the safety, beauty, tranquility and orderliness of neighborhoods that municipal governments are instituted among men. Nothing in the First Amendment prevents government from ensuring that sidewalks are reserved for walking rather than loitering; streets are used as thoroughfares rather than open-

---

> urinating in public, and occasional fights (Contreras Decl., $\partial$ 3, ER:168)–are more significant than the impeding of a vehicle's re-starting that this Court approved in *ACORN*.

Blue Brief at 36, 42. The city reiterates the argument in its reply brief (Grey Brief at 7, 11-12, 15, 17 and 21). The district court record is chock-full of declarations and exhibits documenting these problems, and the district court's opinion devotes an entire section to them. *Comite de Jornaleros de Redondo Beach* v. *City of Redondo Beach*, 475 F. Supp. 2d 952, 963-64, 966 (C.D. Cal. 2006). The majority's claim that the city waived this argument is an invention.

The city's primary focus in its briefing is on traffic problems because the controlling authority at the time the briefs were written was *ACORN* v. *City of Phoenix*, 798 F.2d 1260 (9th Cir. 1986), which emphasized traffic flow and safety in upholding the very similar ordinance there. *Id.* at 1268-70. The city had no way of knowing the case would go en banc and a twenty-five-year-old precedent would be overruled. *See* maj. op. at 17650 n.5. It thus had no reason to argue the other reasons justifying the ordinance with equal vigor.

Unbelievably, the majority holds that the city waived all of these grounds because it did not anticipate that we would overrule *ACORN*, and thus did not offer supplemental briefing or discuss the matter at oral argument. Maj. op. at 17651 n.6. But the city had no reason to initiate such briefing or argument because plaintiffs did not argue that *ACORN* should be overruled. It will come as a rude shock to members of our bar to learn that failure to ask for supplemental briefing in order to argue that an en banc court should *not* overrule a precedent amounts to a waiver, which then precludes a party from arguing that it is entitled to prevail even if the court overrules the precedent sua sponte and without asking for briefing from the parties. Not only does the majority overrule *ACORN* without obtaining the views of the parties, it adopts a draconian waiver rule that violates all reason and justice. And to what end? Just so my colleagues can shut their eyes to inconvenient facts in the record that stand in the way of the outcome they wish to reach. Have we really come to this?

air hiring halls; and bushes serve as adornment rather than latrines. *See* Appendix 2. The majority is demonstrably, egregiously, recklessly wrong. If I could dissent twice, I would.[2]

\* \* \*

Let's start at the very beginning, a very good place to start: Is this even a regulation of speech? Sure, it implicates speech, but almost everything implicates communication of some sort; governing would be impossible if price fixing, streetwalking, gambling, blackmail, employment discrimination, the sale of human organs, operating a retail business and the gazillion other activities that involve communication were all subject to strict scrutiny. They are not, nor is the impromptu labor market that is the subject of this lawsuit. *Cf. City of New Orleans* v. *Dukes*, 427 U.S. 297, 303 (1976); *One World One Family Now* v. *City & Cnty. of Honolulu*, 76 F.3d 1009, 1015 (9th Cir. 1996). Redondo Beach's ordinance seeks to regulate conduct–precisely the kind of conduct that's regulated when we require retail establishments to obtain business licenses, maintain health standards, buy insurance and hire workers based on merit rather than race or sex. Panda Express can't set up a stand anywhere it pleases and start selling moo shu pork to motorists. Any argument that the First Amendment gives them a right to pander to passers-by would be laughed out of court.

But let's say that what's being regulated here is speech–why isn't it a perfectly valid time, place and manner restriction? The ordinance draws no distinctions based on content; it doesn't favor one kind of speaker over another. What it does is to regulate a very narrow and finely drawn class of conduct: standing around on sidewalks and street corners in order to interact with passing motorists. The majority seems to think this makes the ordinance ™significantly overinclusive∫ maj. op. at 17652, because it ™ `technically appli[es]'∫

---

[2]I am authorized to state Judge Bea would also join such second dissent.

to all manner of conduct my colleagues seem to believe is protected, *id.* at 17651 (alteration in original) (quoting *Comite de Jornaleros de Redondo Beach* v. *City of Redondo Beach*, 607 F.3d 1178, 1206 (9th Cir. 2010) (Wardlaw, J., dissenting) (internal quotation marks omitted)). But what's remarkable about the majority's parade of horribles is just how unlikely and contrived they are: children selling lemonade; Girl Scouts selling cookies; ™sidewalk food vendors . . . advertising their wares to passing motorists∫ *id.* at 17652;³ ™a motorist who stops, on a residential street, to inquire whether a neighbor's teen-age daughter or son would be interested in performing yardwork or babysitting,∫ *id.* (internal quotation mark omitted); ™school children shouting `carwash' at passing vehicles,∫ *id.* (internal quotation marks omitted).

The judicial imagination can always run wild in conjuring how laws can be misapplied, but the Supreme Court instructs us that ™the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.∫ *Members of the City Council of L.A.* v. *Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, ™there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.∫ *Id.* at 801. The Court goes on to explain that the effect on third parties can be considered in an overbreadth challenge only to the extent the ordinance will have a ™different impact on any third parties' interests in free speech than it has∫ on the parties before the court. *Id.* This is an important limitation that my colleagues overlook, and it wipes out most of their examples:

---

³The Redondo Beach City Council was, in fact, worried about the traffic problems that might be caused by street vendors and thus strictly limited such vendors in time and place. Sidewalk food vendors are allowed in Redondo Beach only during the summer season and only along one side of the street bordering the beach. Redondo Beach, Cal., Municipal Code ßß 3-7.2001(d), 3-7.2004.

lemonade stands, food carts, cookie vendors, car washers, fund raisers. These activities are far more lovable than a bunch of scraggly men smoking and spitting while waiting for jobs, *see infra* apps. 1-3, but they're entitled to no greater protection from regulation: Each involves someone trying to interact with a motorist while he's still at the wheel. As the Supreme Court explained in *Vincent*, piling on examples of the same kind of conduct affected by the regulation does not an overbreadth challenge make. 466 U.S. at 801-03.

We're left with the driver who stops on a residential street to inquire whether "a neighbor's teen-age daughter or son" can babysit. Frankly, I'm not keen on having drivers cruising neighborhoods trying to lure teenagers into their cars with promises of employment, and I'm reasonably sure the First Amendment doesn't give any broad protection to such activities. But to come up with even these far-fetched examples, the majority has to stretch the statutory language to the limit. Why do that? Our job is not to construe statutes broadly so as to imperil their constitutionality; it's to read them narrowly so as to preserve them. *See NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937) ("The cardinal principle of statutory construction is to save and not to destroy."); *Ashwander* v. *TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring). And the ordinance here can be read quite sensibly to exclude all legitimate overbreadth concerns.

Part (a) of the ordinance makes it "unlawful for any person to stand on a street or highway and *solicit*, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle." Redondo Beach, Cal., Municipal Code ß 3-7.1601 (emphasis added). The operative term here is "solicit," and it can be read broadly as including all communications with motorists, including holding up a billboard urging drivers to support a political candidate or patronize a local establishment; or it can be read narrowly as requiring a face-to-face conversation with a vehicle occupant for the purpose of consummating a transaction on the spot, such as being

hired as a day laborer, obtaining a donation or offering sexual services. It's obvious that the narrower construction is at least plausible: It's consistent with a dictionary meaning of the term,[4] as well as its common understanding. It's also the more plausible meaning, given that the ordinance specifically refers to soliciting employment, which is hard to do while a car is moving. Another important clue is part (b) of the ordinance, which prohibits stopping a vehicle so someone inside can hire or attempt to hire someone outside. Part (b) thus clearly zeroes in on face-to-face communication between people on the sidewalk and people inside the stopped vehicle, which is entirely consistent with a narrow reading of the term "solicit" in part (a). It doesn't matter whether the narrow reading of "solicit" is the *more* plausible; it is enough that it's *a* plausible meaning, which means we must adopt it rather than striking down the law as unconstitutional. This is a fundamental principle of constitutional law each of us learned during our first year of law school, but some of us seem to have forgotten it.

My colleagues in the majority claim that "solicit" is "not reasonably susceptible" to this narrower reading, maj. op. at 17649, but I can't believe they really mean it. How can you argue with the dictionary? The interpretation of "solicit" the majority now rejects as implausible is also the meaning we

---

[4] As the majority acknowledges, maj. op. at 17648, the third edition of *Webster's New International Dictionary* defines "solicit" as "to make petition to" and "*esp*[*ecially*]: to approach with a request or plea (as in selling or begging)." *Webster's New International Dictionary* 2169 (3d ed. 1981). This very clearly contemplates a face-to-face interaction. And the sainted *Webster's Second* defines "solicit" as: "To make petition to; to entreat; importune; as, to *solicit* the king for relief; now, often, to approach with a request or plea, as in selling, begging, etc.; as, to *solicit* one's neighbors for contributions." *Webster's New International Dictionary* 2393 (2d ed. 1939). The notion of approaching someone physically–as a day laborer or street walker must approach a parked car to solicit employment–seems a well-entrenched meaning of the term.

We're each entitled to our own view of the law but not to our own language.

ourselves have given that term for a quarter-century. *See ACORN*, 798 F.2d at 1268. Rejecting an obvious and sensible interpretation of a common word as implausible will cause profound disruptions in many corners of our law, such as the application of *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), where we must determine whether an agency's interpretation of a statute is plausible.

But it gets stranger still: Redondo Beach didn't just pick the word "solicit" out of thin air; it did so in reliance on our own construction of the term in *ACORN*. The record contains a 1987 memorandum by the then City Attorney telling the Mayor and City Council that "[t]he proposed ordinance is identical to one recently approved by the 9th circuit court of appeals," and another written by him a year later describing the ordinance as "prohibiting standing on a street or highway *to solicit employment* from the occupants of vehicles" (emphasis added). Accordingly, this "statute was based specifically on the Phoenix ordinance upheld by the Ninth Circuit in *ACORN*." At oral argument, the City Attorney reiterated: "We took what this court said this ordinance meant. We've enforced this ordinance in the manner in which this court said it was to be enforced." For us now to find Redondo Beach's ordinance "not reasonably susceptible" to an interpretation the city adopted by slavishly copying language we ourselves approved is so strange I have trouble wrapping my head around it.[5]

---

[5]The majority cites *Board of Airport Commissioners of L.A.* v. *Jews for Jesus, Inc.*, 482 U.S. 569 (1987), to support its conclusion that the ordinance can't be salvaged by a narrow reading. Maj. op. at 17649. That case proves just how wrong my colleagues are. The restriction struck down there banned all "First Amendment activities within Central Terminal Area at Los Angeles International Airport." *Jews for Jesus*, 482 U.S. at 571. When the law in question is an absolute prohibition of constitutionally protected activities, there is no way to read it narrowly. Here, we have an ordinance that uses common language that *can* be read narrowly. Our case has nothing in common with *Jews for Jesus*.

If ordinary English and common sense weren't enough, the history of the ordinance shows quite clearly that the city adopted it to deal with a festering problem: men standing on street corners soliciting work from motorists. Patrol Field Sergeant Rody Contreras, who's served in the Redondo Police Department since 1986, reports that ™[f]or approximately 15 years, the City of Redondo Beach has experienced numerous traffic problems with day laborers who solicit employment at the intersection of Artesia Boulevard and Felton Lane, and at the intersection of Manhattan Beach Boulevard and Inglewood Avenue. . . . The Department has received numerous complaints from business owners and residents . . . that the day laborers interrupt the flow of traffic while they contact employers from the City sidewalks and streets[,] . . . commit acts of vandalism, litter, [and] urinate . . . .∫ City Attorney Michael Webb reports that the city ™has received complaints regarding day laborers congregating on street corners at least as far back as 1981. Residents and business owners have complained that the day laborers overcrowd the sidewalks, interrupting the flow of traffic when they contact potential employers; litter; urinate near businesses and in the bush areas of private residences; harass females; and damage property.∫

In 1987, the then City Attorney wrote to the Mayor and City Council supporting what eventually became part (a) of the ordinance: ™As the Mayor and Council are aware[,] the City has had extreme difficulties with persons soliciting employment from the sidewalks . . . over the last several years. . . . There can be little question that traffic and safety hazards occur by this practice.∫ The City Attorney urged passage of ™the proposed ordinance[, which] is identical to one recently approved by the 9th circuit court of appeals,∫ referring to our decision in *ACORN*, 798 F.2d 1260. When the city moved to enhance the ordinance in 1988 by adding part (b), the City Attorney reiterated these justifications: ™This ordinance was designed to alleviate sidewalk congestion and traffic hazards which occurred when large numbers of persons

congregated on the sidewalks during the rush hours to obtain temporary employment.∫

Supporting the 1988 amendment, the North Redondo Beach Business Association wrote to the Mayor complaining about ™the gathering of day laborers.∫ The Association commented: ™We all know this problem has existed for many years. We noticed that it almost diminished shortly after [part (a) of] the ordinance was passed [but] realize that unless there is constant re-enforcement, the problem resurfaces on a frequent basis.∫

In response, the Mayor wrote to the City Council, noting ™the recurring gathering of day laborers.∫ She urged ™that appropriate actions be taken to eliminate this problem of congregating day laborers.∫ This produced part (b) of the ordinance, which applies to motorists who stop to pick up day laborers: ™By adopting this amendment, both the prospective employee and employer would be subject to a misdemeanor offense for soliciting the other from a street or highway.∫ With both parts of the ordinance in place, city officials launched vigorous efforts like the ™Day Laborer Enforcement Project∫ to clean up their city in ways not previously possible. There was no ™Girl Scout Cookie Enforcement Project,∫ ™Lemonade Stand Enforcement Project,∫ ™Push-Cart Vendor Enforcement Project∫ or any other of the horrible abuses the majority fears the ordinance will be subject to.

The drafting and enforcement history is thus entirely consistent with a commonsense reading of the ordinance as applying only to people on sidewalks looking to stop passing motorists so they can deal with them. The city enforces the ordinance consistent with this narrow meaning. Sergeant Contreras, in a sworn declaration, reports that in enforcement operations ™[d]ay laborers were only contacted and arrested when they were on the sidewalk and approached a stopped vehicle. The prospective employer who was charged with violation of [the ordinance] was contacted because he stopped in

a traffic lane to conduct a hiring discussion with day labor-ers.∫

There is no evidence that the city has ever enforced, threatened to enforce or dreamt of enforcing the ordinance against sidewalk food vendors, tyke lemonade moguls, Girl Scout cookie peddlers, high school car washers, disaster relief solicitors or middle-aged men cruising neighborhoods looking to pick up teenage girls from their front yards. Plaintiff has shown none of the *realistic* dangers that the Supreme Court said must be shown in making a facial challenge. *Vincent*, 466 U.S. at 801.

City Attorney Webb declares that the city ™interprets and enforces the Ordinance as prohibiting solicitations that cause drivers of motor vehicles to stop in traffic.∫ As the Supreme Court has instructed us, when considering a ™facial challenge, we must consider the [city]'s authoritative constructions of the ordinance, including its own implementation and interpretation of it.∫ *Forsyth Cnty.* v. *Nationalist Movement*, 505 U.S. 123, 131 (1992).

The majority turns up its collective nose at the city's proffered interpretation as somehow not authoritative enough, maj. op. at 17647-50, but I'm at a loss to understand why a declaration from the city's top law enforcement official doesn't cut the mustard. Time and again, the Supreme Court has accepted the construction of a statute proffered by a state, county or city. *See, e.g.*, *Forsyth Cnty.*, 505 U.S. at 131; *Ward* v. *Rock Against Racism*, 491 U.S. 781, 795 (1989); *Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982); *Grayned* v. *City of Rockford*, 408 U.S. 104, 110 (1972). In *Forsyth*, the Court explained that it considered the county's own interpretation to be ™authoritative∫: ™*In the present litigation*, the county has made clear how it interprets and implements the ordinance.∫ 505 U.S. at 131

(emphasis added). If that's good enough for the Supreme Court, why isn't it good enough for us?**[6]**

My colleagues reject the city's proposed construction with the excuse that they "cannot simply presume the City will act in good faith and adhere to standards absent from the ordinance's face." Maj. op. at 17649 (internal quotation marks and alterations omitted). Good faith has nothing to do with it. If we construe the ordinance to avoid constitutional concerns, our interpretation then defines what the ordinance means. If the city were to enforce it more broadly in the future, it would be subject to a swift injunction: Not only would it be barred by the law of the circuit, judicial estoppel would also preclude it from pressing a broader reading of the ordinance in a future case. *See, e.g.*, *New Hampshire* v. *Maine*, 532 U.S. 742, 749-51 (2001). In other words, if Redondo Beach were to win here based on its proffered construction, it would be stuck with it.

The majority also argues that the ordinance is overbroad because the city has less intrusive means to deal with the problem, such as enforcing existing traffic laws. Maj. op. at 17654-55. But city authorities have tried for years to use other laws to deal with day laborers. Sergeant Contreras recounts that "[n]umerous warnings, both verbal and written, have been given to the day laborers over the years, which have had

---

**[6]**The majority argues that: "Apparently the Dissent agrees with us that the City's proposed interpretation is untenable." Maj. op. at 17649 n.4. Nice try. In fact, I disagree with every word in the opinion, including "the," "and" and "or." Here's what the city actually argues: "The Ordinance is enforced only against solicitors who stand on the sidewalk or street and cause motorists to stop in traffic lanes in response to the solicitation." Blue Brief at 13. The city is saying that it interprets the ordinance as using "solicit" in the narrow sense—that is, involving a face-to-face interaction. Individuals such as street vendors, day laborers and street walkers, who seek to have face-to-face interactions with motorists, cause them to stop; there's no other way to do business with someone in a moving vehicle. Obviously, I agree with this argument—contrary to what my colleagues in the majority seem to think.

little or no effect on the problems they create. Random enforcement has proven to be ineffective or only a temporary solution." City Attorney Webb informs us that, over the past three decades, "[t]he City made numerous efforts to address these complaints, including enforcement of other applicable laws, but these efforts were largely unsuccessful."[7] Business

---

[7]The majority dismisses Webb's declaration as inadmissible. Maj. op. at 17655 n.9. But material produced at the summary judgment stage need not be in the form of admissible evidence. It's for that reason that Federal Rule of Civil Procedure 56(c)(1)(B) directs the court's inquiry to whether "an adverse party *cannot produce* admissible evidence to support the fact"; that 56(c)(2) permits a party to "object that the material cited to support or dispute a fact *cannot be presented* in a form that would be admissible in evidence"; and that 56(c)(4) requires that affidavits "set out facts that *would* be admissible in evidence" (emphases added). Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial.

Accordingly, we held in *Fraser* v. *Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003), that, "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." Similarly, in *Block* v. *City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001), we held that, "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *See also* Adam N. Steinman, *The Irrepressible Myth of Celotex: Reconsidering Summary Judgment Burdens Twenty Years After the Trilogy*, 63 Wash. & Lee L. Rev. 81, 130 (2006) ("Materials offered in opposition to summary judgment . . . are not offered to establish the truth of the matter asserted. They are offered to establish a genuine issue of material fact for trial."). As *Fraser* and *Block* make clear, the question at summary judgment is not whether the form of the evidence presented is admissible, but whether the content is. At trial, the city could easily present admissible evidence of what's in Webb's declaration. For example, former city officials could testify to their personal recollection about their failed attempts to address the city's day laborer problem with ordinances predating this one.

In its Herculean effort to suppress portions of the record it doesn't like, *see also* pp. 17668-69 n.1 *supra*, the majority upends thus yet another line of authority that stands in its way, sub silentio overruling *Fraser* and *Block*. And, in what has now become its calling card, the majority doesn't bother giving the parties an opportunity to brief the issue before mowing down our long-established case law. One must wonder whether the majority is even aware of the cases it casually tramples underfoot.

leaders complained that, "unless there is constant re-enforcement, the problem resurfaces on a frequent basis." I suppose Redondo Beach could park a patrol car and two offi-cers permanently at each of the affected locations to make sure no one violates the parking and littering laws, but this is an extraordinary expense for a small city to bear. Nothing in the First Amendment commands such a sacrifice.

The bottom line is that city officials, after years of effort, found existing tools inadequate or too expensive to rid the city's streets of day laborers. Appointing themselves as a Super City Council, my colleagues–who need not answer to the voters–decide that they know how to run Redondo Beach better than its elected officials. *Id.* at 17654-55 (giving helpful advice as to which laws to enforce to get rid of the problem). This kind of overreaching can only lead to erosion of public confidence in the judiciary. For my part, if city officials swear under oath that they have tried to use existing laws to no avail, I will take their word for it–especially when there is nothing but judicial speculation to contradict them.

In a remarkable passage, the majority claims the ordinance is "geographically overinclusive" because it "applies citywide to all streets and sidewalks in the City, yet the City has intro-duced evidence of traffic problems only with respect to a small number of major streets and medians." *Id.* at 17653. This is a new one on me. Since when are cities and states pre-cluded from passing laws of general applicability because problems manifest themselves only at specific locations? How exactly is a city to ensure that a problem cured by a spot ordi-nance at one location won't migrate elsewhere? Are city offi-cials truly precluded by the First Amendment from exercising

_____

This will be another alarming signal to members of our bar, instructing them that they can no longer proffer shorthand previews of potential evi-dence at the summary judgment stage but must prepare and submit the entire trial record. We will rue the day we started down this perilous path.

legislative judgment in dealing with the city's current and future problems in a citywide ordinance?

Finally, the majority brushes aside the possibility of saving part of the ordinance. *Id.* at 17656 n.10. This is surprising, as there are very good reasons for severing part (b) from part (a). Each part deals with a different aspect of the problem: (a) regulates day laborers and (b) regulates those who drive by and try to hire them. They address fundamentally different conduct, by different groups of people; the sections were passed at different times; and each section can stand without the other's help. Indeed, when it comes to construing the two sections, the majority treats them as if they're totally unrelated, refusing to read part (a) narrowly in light of part (b). But when it comes to throwing them overboard, the majority shackles them together.

Virtually all of the problems the majority has imagined apply to part (a) of the ordinance, not to part (b). Part (b) can easily stand on its own and would achieve a good deal of the city's objective, much as an ordinance prohibiting the patronizing of streetwalkers, if enforced, would go a long way toward cleaning up a red light district. If my colleagues are bent on striking down the entire ordinance, they must find something wrong with part (b) independent of part (a). This they never do.

For a federal court to strike down a state law as constitutionally repugnant is an exercise of enormous power; it strains federal-state relations and undermines popular sovereignty by limiting the authority of elected officials to serve their constituents. It's a power we should exercise cautiously and narrowly–as a scalpel rather than a machete. One way of diminishing this tension is for a court to invalidate only that part of an offending statute that runs afoul of the Constitution and leave in place those portions that are valid. This usually causes the least damage to the statutory scheme, and thus the least friction between the federal government and the states.

It is for that and many other reasons the prudent thing to do. *See, e.g.*, *Brockett* v. *Spokane Arcades, Inc.*, 472 U.S. 491, 501-07 (1985) (severing a state statute after striking down part of it on First Amendment grounds); *Marsh* v. *Alabama*, 326 U.S. 501, 509-10 (1946) (striking down on First Amendment grounds only a single application of a state statute); *Cantwell* v. *Connecticut*, 310 U.S. 296, 307-11 (1940) (striking down on First Amendment grounds a state statute only with respect to one application of it); *see also Ayotte* v. *Planned Parenthood of N. New England*, 546 U.S. 320, 328-31 (2006) (striking down on First Amendment grounds a state statute but remanding for a determination of severability); *City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988) (doing the same for a city ordinance). *See generally* David H. Gans, *Severability as Judicial Lawmaking*, 76 Geo. Wash. L. Rev. 639, 653 (2008) ("Severability doctrine avoids [a] disastrous state of affairs [by] permit[ting] a court to save as much as it can of the legislature's handiwork . . . ."). As the Supreme Court instructs us, it is "the normal rule that partial, rather than facial, invalidation is the required course." *Brockett*, 472 U.S. at 504.

Not all statutes are readily severable. Sometimes the offending provision is so intertwined with other parts of the statute that it's impossible to sever only the offending part; at other times, severing just one key part of the statute so distorts the statutory purpose that it's more prudent to strike down the whole. *See, e.g.*, *Randall* v. *Sorrell*, 548 U.S. 230, 262 (2006) (striking down a state statute on First Amendment grounds and finding that "to sever provisions . . . would require us to write words into the statute"); *Hill* v. *Wallace*, 259 U.S. 44, 70 (1922) (refusing to sever a federal statute despite the presence of a severability clause because the unconstitutional section was "so interwoven" that other sections "cannot be separated. None of them can stand.").

In general, however, severing the offending provision is the more prudent course. This is the view adopted by the Califor-

nia Supreme Court in *Gerken* v. *Fair Political Practices Comm'n*, 863 P.2d 694 (Cal. 1993), where it reaffirmed a three-part test for when severance is appropriate: ™[T]he invalid provision must be grammatically, functionally, and volitionally separable.∫ *Id.* at 698 (internal quotation mark omitted). The Supreme Court has made clear that ™[s]everability of a local ordinance is a question of state law,∫ *Lakewood*, 486 U.S. at 772, so we must adhere to the state supreme court's view as to whether to strike down the ordinance in its entirety or only in part.

Part (b) of Redondo Beach's ordinance breezes through the *Gerken* test. Grammatically, it's an obvious stand-alone. Functionally, it targets potential employers of day laborers and operates just fine on its own. And volitionally, there's every reason to believe that the city ™would have separately considered and adopted [it] in the absence of the invalid portions.∫ *Gerken*, 863 P.2d at 699 (internal quotation mark omitted). Indeed, the city adopted part (b) of the ordinance twenty months after part (a). Thus, if the majority is going to strike down any portion of section 3-7.1601, it should strike down only part (a) and leave intact part (b), whose constitutionality no one has colorably called into question.

The majority insists, yet again, that the city waived the issue. Maj. op. at 17656 n.10. It's true that litigants typically must present arguments for courts to adopt, but severability's not a typical argument. Severability comes into play as a court fashions its remedy upon finding part of a statute unconstitutional. Having reached that conclusion, the court can't escape the question of how much of the statute to take down. It is an inherent part of the process of constitutional adjudication, and we certainly shouldn't make our default to take down everything. To the contrary, we should presumptively preserve as much as possible.

The very case cited by my colleagues illustrates this point. In *Legal Services Corp.* v. *Velazquez,* 531 U.S. 533, 549

(2001), the Court did *not* find severability waived, though it wasn't "discussed in the briefs of either party or otherwise contested here." Instead, the Court simply exercised its "discretion and prudential judgment" in declining to address it. *Id.* And the Court made even clearer in *Brockett* that it could and would opt for severability even when the state didn't seek it. The plaintiffs in *Brockett* argued that, "given that appellants did not argue `severability' in the Court of Appeals, they are precluded from raising it in this Court on appeal." Brief for All Appellees at 44, *Brockett*, 472 U.S. 491 (Nos. 84-28 and 84-143). But, after finding a part of the statute unconstitutional, the Supreme Court deemed it "quite evident that the remainder of the statute retains its effectiveness . . . . In these circumstances, the issue of severability is no obstacle to partial invalidation, which is the course the Court of Appeals should have pursued." *Brockett*, 472 U.S. at 507; *see also United States* v. *Booker*, 543 U.S. 220, 322 (2005) (Thomas, J., dissenting in part) (discussing instances where the Supreme court has applied severability when "the parties in those cases could have raised the issue of severability, but did not bother, because (as is often the case) there was no arguable reason to defeat the presumption of severability"); *Velazquez*, 531 U.S. at 559 (Scalia, J., dissenting) ("Although no party briefed severability in *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC*, 518 U.S. 727 (1996), the Justices finding partial unconstitutionality considered it necessary to address the issue. *Id.*, at 767 (plurality opinion) (`[W]e must ask whether ß 10(a) is severable'); accord, *New York* v. *United States*, 505 U.S. 144, 186 (1992). I think we have that same obligation here."). Even when the Supreme Court ultimately rejects severability, it *still* considers it as a possibility even if the parties made no mention of the issue in their briefs. *See, e.g.*, *Randall*, 548 U.S. at 262. It's diametrically opposed to the Supreme Court's practice for my colleagues to dismiss on waiver grounds the obvious possibility of severability here.

I find it heavy-handed and arbitrary for the majority to take down part (b) of the ordinance even though no one–not the

parties, not the majority, not the district court–has suggested in any way that it's unconstitutional standing on its own. That's like taking out a healthy gall bladder because you've removed an abscessed appendix. The majority obviously needs schooling in the Hippocratic oath.

\* \* \*

I add only a few words about Judge Smith's concurrence which, fortunately, a majority of the court abjures. According to Judge Smith, the ordinance suffers from two additional constitutional infirmities: It's not content-neutral and it doesn't leave adequate alternative channels for communication. The first point is foreclosed by *Hill* v. *Colorado*, 530 U.S. 703 (2000), as even the concurrence seems to recognize. Special Concurrence at 17661-63 (™I recognize that the Supreme Court's decision in *Hill* v. *Colorado*, 530 U.S. 703 (2000), could be read to cast some doubt upon this conclusion.∫). Perhaps Judge Smith's critique of *Hill* will persuade the Court to take up our case and overrule *Hill* but, until it does, we are wise to decide our case consistent with it.

As for adequate alternative channels of communication, no one prohibits the day laborers from advertising in the newspaper or on Craigslist–and many do. Others participate in the six day-laborer centers in Southern California. The centers are easy to find and patrons interested in hiring day laborers can travel to them with a minimum of inconvenience. It is, of course, easier to hire laborers nearby, but there is a crucial difference between having no alternatives and having slightly inconvenient alternatives. See, for example, Appendix 3.

\* \* \*

Judge Gould strikes down the ordinance because the city fails to establish a dedicated day laborer solicitation area. But why does every city need to set aside an area for day laborers

to congregate? I'm aware of no such constitutional mandate, and it strikes me as overkill.

There are 482 municipalities in California–eighty-eight in Los Angeles County alone–and they range from Los Angeles, with almost 3.8 million people and over 500 square miles, to Amador City, with just 185 people and less than one-third of a square mile. Indeed, Redondo Beach is one of nine municipalities tucked along a twelve-mile stretch of coastline. Following the coast north to south, there are El Segundo (16,654 people, 5.5 square miles), Manhattan Beach (35,135 people; 3.9 square miles), Hermosa Beach (19,506 people; 1.4 square miles), Redondo Beach (66,748 people; 6.2 square miles), Palos Verdes Estates (13,438 people; 4.8 square miles), Rancho Palos Verdes (41,643 people; 13.5 square miles), Rolling Hills Estates (8067 people; 3.6 square miles) and Rolling Hills (1860 people; under three square miles). Towering over all of this is gigantic Torrance (145,438 people; 20.6 square miles).

I see no basis for requiring every single one of these mini-municipalities to ™designate[ ] a permissible area for day laborer solicitation,∫ concurrence at 17657, whether it encompasses 500 square miles or just 1/1500 of that, or whether it's overwhelmingly residential, like Rolling Hills Estates, or almost entirely commercial, like the City of Industry with its 219 residents and 80,000 jobs. And it's positively outre to do so while chastising the majority for ™mak[ing] it so hard for municipalities . . . that these municipalities cannot achieve important public goals.∫ *Id.* As Appendix 3 shows, denizens of Redondo Beach can drive just six miles outside their city and find day laborers waiting to be hired. Why isn't that close enough? Where in our First Amendment law does it say that, if you live in Redondo Beach, you must have nine day-laborer solicitation centers within a ten-minute drive?

\* \* \*

I would vacate the judgment of the district court and remand with instructions that it enter judgment for defendant.

*Appendix 1*





*Appendix 2*



*Appendix 3*



South Vermont Avenue just south of Pacific Coast Highway, San Pedro,
California, approximately six miles from Redondo Beach.  Image downloaded
July 15, 2011, 11:59 PM, from
http://maps.google.com/maps?q=San+Pedro,+Los+Angeles,+CA&hl=en&ll=33.7
8937,-118.293459&spn=0.000275,0.000603&sll=37.0625,-
95.677068&sspn=41.818029,107.138672&t=h&layer=c&cbll=33.78937,-
118.293459&panoid=z9GFs0Be6EDXLyiT1P8B5Q&cbp=13,141.88,,1,4.68&z=2
1